IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| Plaintiff, | * |
| v. | Criminal No.: WDQ-10-0279 |
| DUSTIN AXELROD, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

On May 25, 2010, Dustin Axelrod was indicted for distribution and receipt of child pornography in violation of 18 U.S.C. § 2252 (a)(4)(B). For the following reasons, his motions to suppress statements and tangible evidence will be denied.

I. Background

On January 9, 2009, Wicomico County Detective John Seichepine discovered that Internet Protocol ("IP") address 98.211.110.240, located on the Eastern Shore of Maryland, was sharing files which appeared to contain child pornography over the Gnutella public file sharing network. Govt's Opp'n, Ex. 1 at 27. Seichepine established a direct connection with the IP address, downloaded some of the files, and confirmed that they contained child pornography. *Id.*

On January 12, 2009, Seichepine subpoenaed Comcast Communications, the owner of IP address 98.211.110.240, for the identity of the Comcast customer with that address. *Id.* 28. On January 28, 2009, Comcast informed Seichepine that the "suspect IP address" was assigned to Charles Poole of 6993 Amber Fields Court, Salisbury, Maryland. *Id.* Using Maryland Motor Vehicle Administration and Department of Assessments and Taxation records, Seichepine confirmed that Poole's address was 6993 Amber Fields Court. *Id.* at 28-29. He also photographed the residence. *Id.* at 29.

On February 2, 2009, Seichepine obtained a Wicomico County Circuit Court warrant to search 6993 Amber Fields Court for evidence of distribution, production, or possession of child pornography. The warrant contained a picture and description of the house as:

> a brown and tan multiple story residence with a brown roof. The residence has dark brown shutters and two driveways, one located on each side of the residence. The residence has a mailbox post with a mailbox located at the edge of the property with lettering reading "6993." There are two tall trees located in the front flower bed, one on each side of the west facing front door of the residence.

Govt's Opp'n, Ex. 1.

On February 3, 2009, Seichepine performed additional downloads from the IP address, and determined that someone was using the address to share illegal files. Seichepine

2

returned to 6993 Amber Fields Court, and saw two vehicles in the driveway. One was registered to Charles and Susan Poole, and the other was registered to Ann Jones and Axelrod.

At about 6:30 p.m. on February 4, 2009, Seichepine and officers Jessica Hill, Michael White, and Scott Hamilton, Assistant State's Attorneys Jamie Dykes and David Ruark, and Wicomico County Sheriff Michael Lewis executed the warrant. Seichepine knocked on the front door, and Mrs. Poole answered; Mr. Poole was away from the house for a business meeting. The officers entered the residence and performed a "protective sweep." Seichepine took Mrs. Poole into the kitchen and explained the purpose of the warrant.

During the sweep, Lewis opened a kitchen door, walked into a laundry room and through a second door which led to a staircase at the back of the house. The staircase led to a room above the garage; it was part of an in-law suite rented by Axelrod and his cousin. A Linksys wireless router was on the top of the stairwell, and Axelrod was in the room. Axelrod was seated on his bed with a laptop computer at his feet, a disassembled laptop computer was on the floor, and a computer was on a desk. Lewis, who was in uniform, told Axelrod he had a warrant, and directed him to stay seated.

Lewis returned to the kitchen, where Seichepine was speaking with Mrs. Poole. He told Seichepine "I think the guy we're looking for is upstairs." Seichepine immediately went upstairs. He advised Axelrod of his *Miranda* rights and recorded Axelrod's acknowledgment that he understood those rights. Axelrod also signed a *Miranda* form that Seichepine read to him. Axelrod waived his *Miranda* rights and spoke with Seichepine, who recorded the interview.

During the interview, Seichepine sought Axelrod's consent to search his computer and room. He read a consent form to Axelrod, and before Axelrod signed the form or agreed to the search, Seichepine told him "we're going to take your computer, in fact we're going to take every data storage device in this room and we're going to forensically dissect it." Govt's Ex. 6 at 11:50-12:25. Axelrod signed the form authorizing the searches. Officers found child pornography on the computers.

On January 25, 2010, Axelrod was charged in Wicomico County. He was federally indicted on May 25, 2010 for distribution and receipt of child pornography in violation of 18 U.S.C. § 2252 (a)(2) and possession of child pornography in violation of 18 U.S.C. § 2252 (a)(4)(B). ECF No. 1. On July 16, 2010, Axelrod filed his motions to

suppress. ECF Nos. 15 & 16. On March 11, 2011, the Court held a suppression hearing.[1]

At the hearing, Seichepine testified that he believed that the in-law suite is not a separate residence from 6993 Amber Fields Court. He also believed that the search warrant covered the portion of the house rented by Axelrod. He stated that officers are unable to determine whether an internet connection is "secure" or "open" before entering a residence, and that if the connection is open, anyone in the residence can access it. He testified that the Linksys wireless router found on the steps outside Axelrod's room took "the hard connection of the Internet from the cable and boost[ed] the signal into the air [so] other devices . . . [could] use that signal to connect to the Internet."

Lewis testified that when he entered the in-law suite he did not know it was a separate residence. He stated that Mrs. Poole did not tell him it was a separate residence, and he did not learn that it was until Mr. Poole arrived after the search. Mrs. Poole testified that before officers went into the in-law suite she told them the laundry room separated her house from the in-law suite, which Axelrod and his cousin rented. On cross-examination,

---

[1] After the hearing, the parties submitted additional briefing. ECF Nos. 46 & 47.

Mrs. Poole stated that she could have made this statement before or after officers entered the in-law suite and discovered Axelrod. She testified that when officers "asked [her] if anybody was residing [in the in-law suite] . . . [she] told them 'Yes.'" Her best recollection was that was before any officers entered the laundry room.

II. Analysis

A. Motion to Suppress Tangible Evidence

Axelrod argues that the evidence seized from his room should be suppressed because: (1) his consent to the search was not voluntary, (2) officers should have known the search warrant was overbroad before they entered 6993 Amber Fields Court, and (3) during the search, officers became aware that his residence was separate from the rest of 6993 Amber Fields Court. ECF No. 46.

1. Consent to Search

"[V]alid consent to seize and search items provides an exception to the usual warrant requirement." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007). Consent is valid if it is: (1) knowing and voluntary, and (2) given by one with authority to consent. *Id.* The government must prove validity by a preponderance of the evidence, *id.*, and its burden to show that consent "was, in fact, freely and voluntarily given . . . cannot be discharged by showing no

6

more than acquiescence to a claim of lawful authority," *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). Thus, consent is not valid when given because "the official conducting the search has asserted that he possesses a warrant." *Id.* at 548.

Axelrod maintains that before he agreed to the search, the officers told him they had a warrant and would search regardless. Lewis and Seichepine testified that they told Axelrod they had a warrant. Seichepine recorded himself telling Axelrod before his consent was obtained that—regardless of Axelrod's consent—the officers would take his computer and data storage devices pursuant to the warrant. Govt's Ex. 6. The Government has not shown that Axelrod's consent was voluntary.

2. Particularity of the Search Warrant

The Government argues that, even if Axelrod's consent was not valid, the search was lawful because it was conducted pursuant to a warrant. Axelrod contends that before executing the warrant, Seichepine "should have realized from . . . a cursory examination of the target residence—6993 Amber Fields Court—that it, in fact, contained two residences, with two separate entrances, each with its own doorbell, and two separate driveways." ECF No. 38 at 2.

7

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one particularly describing the place to be searched and the person or things to be seized." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "The requirement ensures that [a] search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.*

The particularity requirement is satisfied when "an officer in possession of a search warrant describing a particular place to be searched can reasonably ascertain and identify the place." *United States v. Brooks*, 294 Fed. Appx. 71, 73 (4th Cir. 2008). Generally, when a search involves a building with multiple units, "the warrant must specify the precise unit that is the subject of the search" because "a distinct probable cause determination must be made for each unit." *United States v. Perez*, 484 F.3d 735, 741 (5th Cir. 2007) (internal quotation marks and citations omitted). When officers become aware that a warrant is mistakenly overbroad, they must limit their search to the area intended by the warrant. *See id.* However, the constitutionality of the officer's conduct must be judged

"in light of the information available to them at the time they acted." *Garrison*, 480 U.S. at 85.

The MVA and tax records for 6993 Amber Fields Court indicated that the property was one residence. Seichepine's visit to the address before he applied for the warrant did not reveal anything suggesting that the house had more than one residence. The house is located in a neighborhood of large, single family homes, and the mailbox does not indicate that the house is divided into apartments. The photographs of 6993 Amber Fields Court supporting the warrant application and submitted with the Government's opposition do not indicate that the residence has multiple dwelling units; the house appears to be a typical, single family home. Thus, before entering the home, the officers reasonably believed that the warrant was sufficiently particular.[2]

    3. Execution of the Search Warrant

Axelrod argues that upon entry of 6993 Amber Fields Court the officers "were on specific notice that they were

---

[2] *See United States v. Logan*, 998 F.3d 1025, 1032 (D.C. Cir. 1993) (officer reasonably believed house was single residence when, before applying for warrant, the officer visited the house and "noticed nothing on the exterior to suggest that it was not a single family residence" and "[t]here were no signs advertising rooms for rent, no rows of mailboxes, [and] no multiple listing of names at the front door.").

9

required to seek another search warrant" because Mrs. Poole informed them of the in-law suite, and the officers "had no basis, reasonable or otherwise, for believing that the warrant authorized entry and search of [the suite]." ECF No. 46 at 3. The Government contends that the search was reasonable because the warrant authorized a search of the entire premises—the criminal activity could have taken place anywhere within 6993 Amber Fields Court—and after entering the home, the officers were unaware that it contained two residences. ECF No. 47 at 7-8.

"[A] valid search warrant can turn into an invalid general search" when officers "flagrantly disregard [its] limitations." *United States v. King*, 227 F.3d 732, 751 (6th Cir. 2000). Because "the scope of the warrant . . . is dependent upon the extent of the showing of probable cause, . . . [t]he command to search can never include more than is covered by th[at] showing." *United States v. Whitney*, 622 F.2d 902, 907 (9th Cir. 1990). Accordingly, the Fourth Amendment is violated if officers searching a multi-unit property do not discontinue their search upon discovering that they are in a unit "erroneously included within the terms of the warrant"—i.e. a unit for which the issuing magistrate has not made a probable cause determination. *Garrison*, 480 U.S. at 87.

But, "[e]ven if a warrant authorizes the search of an entire premises containing multiple units while reciting probable cause as to a portion of the premises only," a continued search is not unlawful when: (1) "the defendant [is] in control of the whole premises"; (2) the premises are "occupied in common"; (3) "the entire premises [are] suspect"; or (4) "the multiunit character of the premise [is] not known to the officers." *United States v. Gilman*, 684 F.2d 616, 618 (9th Cir. 1982). In other words, "there is no Fourth Amendment violation [if] the officers executing the search reasonably believe that the warrant is sufficiently particular and that they are searching the correct location." *United States v. Bob*, 166 F.3d 1210, 1210 (4th Cir. 1998).

At the suppression hearing, Lewis and Seichepine testified credibly that they did not know that Axelrod's room was a separate residence when they entered it. Mrs. Poole could not recall whether she told the officers someone resided in the in-law quarters before or after Axelrod had been located. Further, the hearing established that the only separation between the in-law suite and the rest of the Pooles' residence was a set of unlocked

interior doors.[3] There were no indications on the doors that Axelrod's room was a separate residence. On these facts, the officers reasonably believed that 6993 Amber Fields Court was a single residence. *Gilman*, 684 F.2d at 618.[4]

Had Mrs. Poole told the officers that Axelrod rented the in-law suite before they searched it, suppression would not be required because the warrant could reasonably be interpreted as providing probable cause to search all of 6993 Amber Fields Court—"the entire premises were suspect" because the internet connection was open and anyone in the residence could access it—and Seichepine testified at the hearing that this was his belief when he executed the warrant. *Gilman*, 684 F.2d at 618.

In determining whether there is probable cause to issue a search warrant, "[t]he task of the issuing

---

[3] Mrs. Poole testified that she and her husband did not lock their side of the door, and that Axelrod and his cousin could access their part of the house.

[4] *See United States v. Fennell*, 496 F. Supp. 2d 279, 283 (S.D.N.Y. 2007)(warrant was not unreasonably executed when "none of the detectives who testified heard [the] defendant or anyone else indicate that the residence was a multi-family unit" and "[t]he interior 'apartments' did not have separate entrances or unit numbers", "the rooms in the house were separated by 'internal' doors, rather than doors with bolt looks" and "persons living in any of the 'apartments' had open access to the other 'apartments' in the residence.").

magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983).[5]

Here, the warrant authorized the search of "6993 Amber Fields Court Salisbury, Wicomico County Maryland, to include any and all vehicles located on the property," and did not limit the search to the Pooles' portion of the residence, or indicate that the Pooles were the targets of the investigation. Govt's Opp'n, Ex. 1. The affidavit supporting the warrant indicated that some computer user at the location associated with the suspect IP address had downloaded and distributed child pornography. The

---

[5] Probable cause to search for child pornography may be shown by an affidavit that officers discovered a user of a particular IP address possessed child pornography and officers then connected that IP address to a physical location. *See United States v. Massey,* 2009 WL 3762322, at *6 (E.D. Mo. Nov. 10, 2009) ("Police officers discovered that a user of the specific IP address possessed child pornography. That IP address was then linked to a specific physical residence. Therefore, there existed a fair probability that child pornography would be found at that residence to support the Search Warrant."). The affidavit need not name a suspected individual; rather that is only one of the considerations "contribut[ing] to the totality of the probable cause determination." *United States v. Lapsins,* 570 F.3d 758, 766 (6th Cir. 2009).

affidavit gave the issuing judge a substantial basis to conclude that child pornography would be located somewhere at 6993 Amber Fields Court, not merely within the Pooles' portion of the residence.[6] Seichepine's belief that the warrant authorized a search of the entire premises located at 6993 Amber Fields Court was reasonable.[7] Accordingly, Axelrod's motion to suppress the tangible evidence seized pursuant to the warrant will be denied.

B.  Motion to Suppress Statements

Axelrod argues that admission of his statements at trial would violate the Fifth Amendment because the statements were not given voluntarily. ECF No. 16 at 2. The Government argues that absent evidence of police coercion, Axelrod's statements were voluntary. ECF No. 47.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness

---

[6] See United States v. Tillotson, 2008 WL 5140773, at *7 (E.D. Tenn. Dec. 2, 2008) (Because "the United States had probable cause to believe that a computer located in the residence of 1240 Catawba Street was being used to transmit and receive images of child pornography," and "[a]s far as the United States knew, any of the occupants of 1240 Catawba Street . . . could have used the computer to send and receive child pornography," officers were "reasonably . . . authorized to search throughout the entire [multi-family] house.").

[7] See United States v. Aljabari, 626 F.3d 940, 947 (7th Cir. 2010)("an executing officer must interpret a warrant's terms reasonably, but the officer need not give them the narrowest possible reasonable interpretation.").

14

against himself." U.S. Const. amend. V. "A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause," and "[t]he test for determining whether a statement is involuntary . . . is whether the confession was extracted by any sort of threats or violence, obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (internal citations and quotation marks omitted).

The crucial inquiry is whether the defendant's will has been "overborne" or his "capacity for self determination critically impaired." *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987). A finding of involuntariness requires coercive government conduct. *Colorado v. Connelly*, 479 U.S. 157, 165 (1986); *United States v. Elie*, 111 F.3d 1135, 1143-44 (4th Cir. 1997) ("coercive police activity is a necessary predicate to a finding that a statement is not voluntary within the meaning of the due process clause.").

The evidence at the hearing was that Seichepine read, and Axelrod acknowledged and waived, the *Miranda* rights. *See* Govt's Ex. 4. Axelrod remained in his room during the interview and was not handcuffed. At most, three to four

15

law enforcement officials were present in the room, and only Seichepine questioned Axelrod. No officer told Axelrod that he was under arrest or threatened him. Axelrod never asked if he could leave, and he was allowed to use the restroom, although a male officer accompanied him. Although Axelrod testified that he agreed to speak to Seichepine because he felt he had no choice, there is no evidence that his "will [was] overborne or his capacity for self-determination critically impaired." *Pelton*, 835 F.2d at 1071-72.[8] Accordingly, his motion to suppress the statements will be denied.

III. Conclusion

For the reasons stated above, Axelrod's motions to suppress will be denied.

_4/29/11_
Date

_William D. Quarles, Jr._
United States District Judge

---

[8] *See United States v. Jumper*, 3 Fed. Appx. 141, 144 (4th Cir. 2001)(statements were voluntary when interview was conducted in the defendant's home, the defendant was not placed under arrest, and officers did not attempt to deceive the defendant or subject her to a lengthy period of interrogation or isolation); *Elie*, 111 F.3d at 1143 (statement was voluntary when officers did not: (1) harm or threaten to harm the defendant if he did not answer questions, (2) deprive the defendant of anything, (3) subject the defendant to long period of interrogation, or (4) try to deceive the defendant).